UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| MARY ANNE WOOLS, | ) | |
| (Social Security No. XXX-XX-1989), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:07-cv-135-WGH-RLY |
| | ) | |
| MICHAEL J. ASTRUE, COMMISSIONER | ) | |
| OF SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM DECISION AND ORDER

This matter is before the Honorable William G. Hussmann, Jr., United States Magistrate Judge upon the Consents filed by the parties (Docket Nos. 10, 29) and an Order of Reference entered by District Judge Richard L. Young on February 27, 2009.  (Docket No. 30).

## I.  Statement of the Case

Plaintiff, Mary Anne Wools, seeks judicial review of the final decision of the agency, which found her not disabled and, therefore, not entitled to Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act"). 42 U.S.C. §§ 416(i), 423(d); 20 C.F.R. § 404.1520(f).  The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for DIB on June 27, 1995, alleging disability since October 2, 1994.  (R. 84-87).  The agency denied Plaintiff's application both initially and

on reconsideration on January 23, 1996. Plaintiff did not appeal this decision further. (R. 33-37, 43-46). Plaintiff again applied for DIB on May 30, 2000, alleging disability since July 14, 1995.[1] (R. 31-33). The agency denied Plaintiff's application both initially and on reconsideration. (R. 47-50, 52-53). Plaintiff appeared and testified at a hearing before Administrative Law Judge Anne C. Pritchett ("ALJ") on February 7, 2002. (R. 499-529). Plaintiff was represented by an attorney; also testifying was a vocational expert, Dr. Thomas Mehaffy. (R. 499). On March 28, 2002, the ALJ issued her opinion finding that Plaintiff was not disabled because she retained the residual functional capacity ("RFC") to perform a significant number of jobs in the regional economy. (R. 17-26). The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 6-8). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a Complaint on September 6, 2005, seeking judicial review of the ALJ's decision. Eventually, the parties stipulated to a remand of the case for further administrative proceedings, this court entered an order remanding the case, and the Appeals Council returned the case to the ALJ for a new determination. (R. 552-57).

On remand, ALJ Pritchett conducted a new hearing on September 13, 2006. (R. 661-92). Again, Plaintiff was represented by an attorney; this time testifying was a different vocational expert, Frank E. Kern. (R. 661). On March

---

[1]Plaintiff was only insured for DIB through March 31, 2001. (R. 572). Because she did not appeal the final decision of the Secretary dated January 23, 1996, Plaintiff must establish that she was disabled after that date, but before March 31, 2001.

8, 2007, the ALJ issued her opinion finding again that Plaintiff was not disabled because she retained the RFC to perform a significant number of jobs in the regional economy.  (R. 541-50).  The Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision as the final decision of the Commissioner. (R. 530-32).  20 C.F.R. §§ 404.955(a), 404.981.  Plaintiff then filed a Complaint on October 4, 2007, seeking judicial review of the ALJ's decision.

## II.  Statement of the Facts

### A.  Vocational Profile

Born on March 27, 1953, Plaintiff was 48 years old at the time of her date last insured, March 31, 2001.  She has a high school education and an Associate's degree.  (R. 140, 549).  Her past relevant work experience included employment as a computer specialist/supply system analyst and management analyst.  (R. 549).

### B.  Medical Evidence

#### 1.  Physical Impairments

Timothy Pettigrew, M.D., examined Plaintiff on June 15, 1995.  Based on this single examination and a four-paged typed summary of her symptoms, very well organized, he diagnosed chronic fatigue syndrome ("CFS").  (R. 262).  Dr. Pettigrew reported that this condition "is life long.  It has periods of exacerbation and remission . . . it is likely that if Plaintiff has increased periods of stress, either physical, mental, or emotional, that she may have exacerbations of her chronic fatigue syndrome and increase in all her symptomatology."  (R. 264-65).

In a letter to Plaintiff's federal employee retirement system, Dr. Pettigrew wrote that work restrictions should be "decided per the patient," and that he had "no restrictions for this patient." (R. 265). He continued that "she . . . may have many restrictions and these will be real restrictions that limit her." (R. 265).

On March 14, 1996, Dr. Pettigrew examined Plaintiff and made normal findings. (R. 260). Dr. Pettigrew diagnosed tremors with possible seizures, noting Plaintiff most likely had pseudoseizures. (R. 260). He recommended that, if a neurological work-up was negative, she should undergo neuropsychiatric testing. (R. 260). Dr. Pettigrew also diagnosed fatigue. (R. 260). On November 22, 1996, Plaintiff underwent an EEG which indicated no epileptic activity and was normal. (R. 424).

Since 1982, and throughout the entire relevant period (1995-2001), Plaintiff's treating primary care doctor has been James P. Poirier, M.D. In visits in 1996, Dr. Poirier noted symptoms of CFS. (R. 418-19). On May 19, 1998, Plaintiff requested of Dr. Poirier's office a portable oxygen unit and a prescription for Toradol for exposure to chemicals. (R. 417).

In an undated evaluation, that Defendant contends likely occurred in the summer of 1998, T. Scott Prince, M.D., evaluated Plaintiff for her multiple allergies at the request of Dr. Poirier. (R. 306-10, 416). Physical examination was normal. (R. 310). Dr. Prince diagnosed history of CFS/fibromyalgia with aspects of chemical sensitivity. (R. 310). He recommended she use home oxygen. (R. 310).

On July 29, 1998, Terrance R. Collins, M.D., evaluated Plaintiff at the referral of Dr. Poirier for her symptoms of fatigue and increased sensitivity to allergies; he noted she had not been examined by an allergist. (R. 304). Dr. Collins reviewed that Plaintiff had been diagnosed with a chronic illness which had been identified as fibromyalgia, CFS, and chemical sensitivity. (R. 304). Dr. Collins noted that his examination was brief, since Dr. Prince had done a complete environmental evaluation. (R. 304). Neurological and mental status examinations were normal, with Dr. Collins writing that she "appears entirely normal," was not depressed, had a good affect, and a good mood expression. (R. 305). Dr. Collins assessed CFS, fibromyalgia, and multiple chemical sensitivity. (R. 305).

Plaintiff returned to Dr. Collins on September 8, 1998, reporting that she was feeling better and that her fatigue had improved somewhat. (R. 302). She reported that oxygen use had relieved most of her symptoms when her allergies became exacerbated. (R. 302). Plaintiff had been taking vitamin supplements and following an allergy elimination diet. (R. 302). Physical examination showed a "happy and alert female with no specific pain today." (R. 302). Dr. Collins continued the same diagnoses and a prescription for Toradol. (R. 302).

In 1999, Plaintiff went to Dr. Poirier's office primarily for updated prescriptions for Trazodone. (R. 415).

On June 2, 1999, she returned to Dr. Collins, reporting that she had undergone a laparoscopic cholecystectomy (gall bladder removal) in January

1999, and had not regained her stamina.  (R. 301).  Dr. Collins' physical examination does not appear in the record.  (R. 301).

On May 9, 2000, Daniel C. Eby, D.O., evaluated Plaintiff, at Dr. Poirier's referral, for hip pain following a fall while getting out of the bath tub.  (R. 367-68).  He diagnosed left greater trochanteric bursitis, and possible left hip radiculopathy from the spine.  (R. 368).  During the first consultation, Dr. Eby reported reduced patella and Achilles reflexes and x-ray results of the lumbar spine demonstrating "facet sclerosis."  (R. 367).  Dr. Eby recommended physical therapy.  (R. 367).

When Plaintiff returned to Dr. Eby on June 19, 2000, she reported "pain shooting down her leg" but said that her back had improved with physical therapy.  (R. 370).  Dr. Eby noted an MRI showed mild degenerative joint disease at the L4-5 level.  (R. 370, 379).  Dr. Eby opined that the MRI findings were mild, and he surmised that the pain shooting down her left leg was secondary to fibromyalgia or ilio-tibial band syndrome.  (R. 370).  He did not believe there was anything more for her to do at that time, noting that steroid injections were not advised given her chemical sensitivity, and recommended she continue the strengthening program for the lumbar spine.  (R. 370).

On June 19, 2000, five years after Plaintiff's initial diagnosis of CFS, Dr. Poirier wrote an open letter informing that Plaintiff had last been seen in his office on March 29, 2000, and was being seen by several specialists.  (R. 408).  He noted that she continued to have symptoms associated with her main

problems of fibromyositis, CFS, and multiple allergies that may be associated with pain and pseudoseizure activity.  (R. 408).  She had recently developed an arthritic type problem with her left hip and a roaring noise in her ear.  (R. 408). Dr. Poirier opined that, "[t]he prognosis for significant improvement is poor.  I feel she is permanently disabled.  Her diagnoses at this time include Fibromyositis, chronic fatigue syndrome, multiple allergies/sensitivities and osteoarthritis.  Return to any work at this time would contribute to a worsening of her condition . . . ."  (R. 408).

In January 2001, Plaintiff went to Dr. Poirier's clinic for pharyngitis, chest pain, and fibromyalgia, and in February 2001, she was diagnosed with acute costochondritis.  (R. 412).

On March 9, 2001, Dr. Poirier completed a form for the state agency in which he informed that he had most recently examined Plaintiff on February 28, 2001, and listed her diagnoses as fibromyalgia, CFS, costochondritis and osteoarthritis, with an onset date of 1995.  (R. 409).

On March 20, 2001, Dr. Poirier wrote a letter addressed to Plaintiff's attorney opining that Plaintiff was "totally disabled at this time because of multiple problems including fibromyalgia/fibromyositis, CFS, multiple allergies/sensitivities and she also has pain related to osteoarthritis and costochondritis."  (R. 407).  He wrote that her multiple allergies were "particularly disabling," since even small amounts of smoke, chemicals and perfumes "can cause a sensitivity reaction with severe worsening of her

fibromyalgia pain and a pseudo-seizure type reaction.  This obviously limits all her activities even her routine activities of daily living."  Her prognosis was poor, and he emphasized her inability to work in any occupation.  (R. 407).

On May 1, 2001, Rafael Grau, M.D., a rheumatologist at Indiana University, evaluated Plaintiff for her complaint of general pain, at Dr. Poirier's referral.  (R. 442).  Upon musculoskeletal examination, Dr. Grau found no evidence of synovitis of the small joints of the hands and range of motion was full; she had good range of motion of her wrists, elbows, shoulders, hips, knees, and ankles; and she had tenderness in the costochondral junction, greater on the right side.  (R. 443).  In his impression, Dr. Grau listed fibromyalgia including costochondral pain, CFS, and multiple chemical allergies.  (R. 444).  Dr. Grau continued by explaining that Plaintiff did not have evidence of an inflammatory or rheumatic condition, and he believed further evaluation was not necessary.  (R. 444).  He commented that Plaintiff had rather characteristic and chronic pain amplifications syndrome, which included that costochondral region.  (R. 444).

Dr. Grau also completed a Fibromyalgia Residual Functional Questionnaire on October 30, 2001.  (R. 440-42).  In it he explained that he felt that her descriptions of fatigue and pain, which occur daily, were supported by objective and subjective findings, and that emotional issues contributed to her symptoms and functional limitations.  He listed her established symptoms of fibromyalgia as "multiple tender points, non-restorative sleep, severe fatigue, and

depression" with pain located bilaterally in the shoulders, arms, hips, legs, knees/ankles/feet and in the cervical spine and chest.  Dr. Grau further noted that Plaintiff's ability to deal with work stress had a "marked limitation," while her concentration was "frequently" impacted by her fatigue and pain.  Most importantly, he felt that she was unable to work on a sustained basis of eight hours a day, five days a week; if she was to return to work, he felt she would miss more than three times a month due to her medical conditions.  He also noted the significance of her chemical sensitivities, stating that Plaintiff would require an oxygen mask for flare-ups if in a work setting.  (R. 441-42).

In a consultative physical examination of Plaintiff on May 12, 2001, Greg Ward, M.D., noted Plaintiff's report of CFS since 1994 and that she had a history of fibromyalgia "officially confirmed last week by rheumatologists at IU."  (R. 432).  Dr. Ward also recorded Plaintiff's multiple chemical sensitivities, especially to petroleum-based products.  (R. 432).  She also reported a history of depression.  (R. 432).  Her musculoskeletal examination was normal, with full range of motion throughout the spine and extremities, normal gait and station, and negative straight leg raise.  (R. 433).  On neurological examination, she was alert and oriented, her muscle strength was 4/5 and symmetrical throughout, motor functions and sensory functions were intact, grip strength was 4/5, and she had normal fine motor manipulation.  (R. 433).  Dr. Ward diagnosed a history of CFS, fibromyalgia, and multiple chemical sensitivities; he noted she suffered from extreme fatigue, diffuse myalgias, sleep difficulties, and acute

attacks of seizure-like activities and debilitating pain when exposed to any type of multiple allergens.  (R. 434).

### 2.  Hospitalizations

On March 6, 1996, Plaintiff was admitted to Memorial Hospital with a history of episodes of tremors and headaches, and a reported difficulty with mental tasks.  (R. 248).  She was admitted after developing a headache, some confusion, and right-side jerking.  (R. 248).  A CT scan of the head was normal; MRI of the brain was negative; an EEG showed no abnormality, and an EKG was normal.  (R. 248, 255-58).  Neurologist Henry J. Matick, D.O., noted her report that she had quit her job eight months before because she was having trouble with her memory and performing certain tasks.  (R. 250).  On examination, Dr. Matick found she was pleasant, cooperative, and in no apparent distress.  (R. 251).  Her mental status, cranial nerve, sensory, and cerebellar examinations were normal.  (R. 251).  Dr. Matick diagnosed possible seizure disorder by history and recommended temporarily continuing Tegretol.  (R. 251).  Upon her discharge on March 8, 1996, Dr. Poirier diagnosed atypical seizure disorder, chronic myalgia, and CFS.  (R. 249).  On March 14, 1996, she received treatment from the Indiana University Clinic for painful tremors and seizures of her arms and legs, with complaints of fatigue.  (R. 275).

On May 17, 1998, Plaintiff went to the emergency room reporting exacerbation of her fibromyalgia after exposure to smoke.  (R. 398).  She stated that she had been diagnosed with CFS and fibromyalgia and that symptoms of

the latter became exacerbated with exposure to any type of toxins.  (R. 398).  She
had never needed to go to the emergency room for treatment of her symptoms.
(R. 398).  An examination was normal.  (R. 398).  Plaintiff was given oxygen and
Toradol, and after experiencing "almost complete resolution of her pain," she was
discharged home with a diagnosis of acute exacerbation of fibromyalgia.  (R.
398).

Plaintiff went to the emergency room on September 2, 1998, reporting that
she had been having acute chemical sensitivities and "seizures" whenever she
was exposed to any type of chemical.  (R. 278, 326).  She came to the emergency
room because the waiting room at her counselor's office had cigarette smoke and
she began having a seizure.  (R. 278, 496).  Plaintiff reported to David T. Blank,
D.O., who examined her, that the seizures had not shown up on EEGs, MRIs or
a CT scan.  (R. 278).  An examination was normal.  (R. 278).  Dr. Blank opined
that he was not sure what was going on with Plaintiff.  (R. 278).  It did not
appear she had any seizures, given that the EEG gave no indication of them.  (R.
278).  Also, atypical seizures should not respond to Toradol and oxygen, as
Plaintiff had reported hers had.  (R. 278).  Dr. Blank wrote that, because Plaintiff
was completely relieved with Toradol, "it is unclear if this may be some type of
psychosomatic event responding to Toradol in a placebo-like fashion or not."  (R.
278).

Plaintiff was hospitalized on September 14, 1999, due to another chemical
sensitivity reaction.  (R. 323).

-11-

On February 12, 2001, Plaintiff went to the emergency room due to onset of "seizure like activity . . . [with] pain on the entire right side of her body, weakness . . . occasionally has jerking movements to her entire body." (R. 394). She said the symptoms started after exposure to odor/perfume at a meeting earlier in the evening. (R. 394). The doctor noted that Plaintiff's symptoms had always improved with Toradol. (R. 394). Upon neurologic examination, Dr. Stephen L. DeWitt, D.O., found "no focal or sensory deficits." (R. 394). He noted that Plaintiff had occasional jerking movements but did not lose consciousness and wrote "[t]hey appear to be under voluntary control of the plaintiff." (R. 394). After examination and receiving a Toradol injection, Plaintiff was discharged in satisfactory condition with the diagnosis of "pseudoseizures." (R. 395).

### 3. Mental Health Treatment

On November 13, 1995, Joel S. Dill, Ed.D., completed a consultative psychological evaluation of Plaintiff at the request of the state agency. (R. 387). Dr. Dill noted presenting problems of muscle tremor and CFS. (R. 387). Dr. Dill observed that Plaintiff's gait and station were normal; her gross motor movements were normal; her fine motor manipulation was coordinated without tremor; she had no restricted mobility; and her attention was adequate. (R. 387). Plaintiff reported that she forgot things easily, and she could not do any cognitive problems such as reading or paperwork. (R. 387). On mental status examination, Dr. Dill found she was fully oriented, her mood and affect were appropriate with adequate eye contact; her speech was normal and without

pressure, and she responded appropriately to questions; her thought processes were generally fluid, with some word finding problems.  (R. 388).  Plaintiff reported that she could perform her self care activities independently; she watched TV and rested a lot; she did simple crafts; she visited with a friend about two to three times weekly; she did a little housework at a time; and she grocery shopped weekly.  (R. 389).  Dr. Dill diagnosed "undifferentiated somatoform disorder substantiated by no specific diagnosis of the physical conditions," although he noted her reports of episodic pain.  (R. 390).  He assigned a current global assessment of functioning ("GAF") score of 55, indicating moderate symptoms.  (R. 390).

On August 5, 1998, Plaintiff began counseling with Christi Ryan, M.S.W., who noted in this first visit that Plaintiff dealt with low self image and esteem. (R. 498).  In the next weeks, Plaintiff discussed her ex-husband and current husband, and asked to switch their meeting location due to her chemical sensitivities.  (R. 494-97).

On September 18, 2000, Dr. Dill performed another psychological evaluation of Plaintiff.  (R. 383).  He observed that her attention and concentration were adequate.  (R. 383).  On mental status examination, Dr. Dill found she was fully oriented, her mood and affect were appropriate with adequate eye contact; her speech was normal and without pressure, and she responded appropriately to questions; her mental trend and thought content were normal; and memory testing placed her in the average to low-average range.

-13-

(R. 385-86).  Dr. Dill diagnosed dysthymic disorder and found some elements of post-traumatic stress disorder; he assigned a GAF score of 65.  (R. 386).

On January 4, 2001, Plaintiff again participated in a session with Christi Ryan.  (R. 494-95).  Ryan discussed Plaintiff's annulment of her first marriage and concerns for her daughter.  (R. 494).  The next visits extending into April 2001 focused on her relationship with her husband and trips they hoped to take upon his retirement, frustration with the disability process, her nephew's death, annulment of her first marriage, and her daughter's behavior.  (R. 484-93).

On March 15, 2001, Ryan, who had seen Plaintiff the day before, completed a form for the state agency informing that Plaintiff's current diagnoses were post-traumatic stress disorder, with onset in 1990, and dysthymic disorder. (R. 400).  Ryan stated that Plaintiff had not undergone psychological testing.  (R. 401).  She stated that Plaintiff had a memory impairment, perceptual or thinking disturbance, mood disturbance, emotional disturbance and emotional lability. (R. 401).  Ryan also opined on a number of depressive symptoms, including difficulty concentrating or thinking, as well as pain and preoccupation with disease associated with somatoform disorder, sleep loss, psychomotor retardation, decreased energy, and feelings of guilt and worthlessness.  (R. 401-03).  Situations triggering Plaintiff's symptoms included social functions, work settings, home, and travel.  (R. 404).  Ryan opined that Plaintiff's illness had caused deficiencies in social functioning and in concentration and persistence. (R. 404).  Plaintiff was undergoing weekly or biweekly psychotherapy and took

-14-

Trazodone for depression and sleep.  (R. 405).  Ryan explained that Plaintiff had been involved in a chronic abusive marriage which caused her post-traumatic stress disorder, and that this disorder was "symbiotic" with her toxic sensitivity, in that the two conditions fed off of each other.  (R. 406).

On January 24, 2002, Ryan reported a diagnosis of depressive disorder and post-traumatic stress disorder.  (R. 463).  Ryan noted "daily impaired memory interferes with completing tasks and insufficient energy . . . ."  (R. 469).  She also listed Plaintiff's symptoms of pressured speech, easy distractibility, motor tension, apprehensive expectation, vigilance and scanning, and recurrent intrusive recall of trauma.  (R. 465).

### 4.  State Agency Review

On August 3, 2000, a state agency physician, A. Dobson, M.D., reviewed the record and completed a Physical Residual Functional Capacity Assessment (R. 219-26), assessing diagnoses of fibromyalgia, chemical sensitivity, pseudoseizures, and left hip pain.  (R. 219).  Dr. Dobson opined that Plaintiff could lift 20 pounds occasionally and ten pounds frequently and stand/walk for about six hours and sit for about six hours in an eight-hour day.  (R. 220).  As support for this opinion, Dr. Dobson noted various clinical findings.  (R. 220-21).  Dr. Dobson also opined that Plaintiff could never climb ropes, ladders, or scaffolds; could occasionally stoop, kneel, and crouch; should avoid concentrated exposure to humidity; and should avoid even moderate exposure to fumes, odors, and gases.  (R. 221, 223).  In addition, she should avoid

-15-

concentrated exposure to noise and vibration.  (R. 219-26).  On June 5, 2001, another state agency physician affirmed the August 3, 2000 opinion of Dr. Dobson.  (R. 226).

On October 3, 2000, a state agency psychologist J. Gange, Ph.D., reviewed the record and opined that Plaintiff's dysthymic disorder did not constitute a "severe" impairment under the regulations, noting that she had undergone no psychiatric treatment, her intelligence testing was within normal limits, and her GAF score of 65.  (R. 204, 214, 216).

### III.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971); see also *Perkins v. Chater,* 107 F.3d 1290, 1296 (7th Cir. 1997).  This standard of review recognizes that it is the Commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility.  *Richardson,* 402 U.S. at 399-400.  Accordingly, this court may not re-evaluate the facts, weigh the evidence anew, or substitute its judgment for that of the Commissioner.  *See Butera v. Apfel,* 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits.  *Schmidt v. Apfel,* 201 F.3d 970, 972 (7th Cir. 2000).

## IV.  Standard for Disability

In order to qualify for disability benefits under the Act, Plaintiff must establish that he suffers from a "disability" as defined by the Act.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations set out a sequential five-step test the ALJ is to perform in order to determine whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. The ALJ must consider whether the claimant:  (1) is presently employed; (2) has a severe impairment or combination of impairments; (3) has an impairment that meets or equals an impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) is unable to perform his past relevant work; and (5) is unable to perform any other work existing in significant numbers in the national economy.  *Id.*  The burden of proof is on Plaintiff during steps one through four, and only after Plaintiff has reached step five does the burden shift to the Commissioner.  *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

## V.  The ALJ's Decision

The ALJ concluded that Plaintiff was insured for DIB through March 31, 2001.  Plaintiff also had not engaged in substantial gainful activity since the alleged onset date.  (R. 543).  The ALJ found that, in accordance with 20 C.F.R.

§ 404.1520, Plaintiff had four impairments that are classified as severe:  (1) chemical sensitivities/allergies; (2) depression; (3) a somatoform disorder; and (4) mild degenerative disc disease.  (R. 543).  The ALJ concluded that these impairments did not meet or substantially equal any of the impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 545).  Additionally, the ALJ opined that Plaintiff's allegations regarding the extent of her limitations were not fully credible.  (R. 547).  Consequently, the ALJ concluded that Plaintiff retained the RFC for semi-skilled sedentary work in a clean environment with only rare or minimal exposure to chemicals, fumes, gases, etc., and with no physical contact with the general public.  (R. 546).  The ALJ opined that Plaintiff did not retain the RFC to perform her past work.  (R. 549).  However, Plaintiff was a younger individual at her time last insured, and there were significant numbers of jobs in the national economy that Plaintiff could perform.  (R. 549).  In making this finding, the ALJ disregarded the opinions of vocational expert Dr. Kern expressed at Plaintiff's hearing and relied instead upon the opinion of vocational expert Dr. Mehaffey from a previous hearing to find that there were jobs that Plaintiff could perform.  (R. 550).  The ALJ concluded by finding that Plaintiff was not under a disability.  (R. 550).

## VI.  Issues

The court has examined Plaintiff's brief and concludes that Plaintiff has essentially raised five issues.  The issues are as follows:

1.   Whether the ALJ failed to give proper weight to treating physician Dr. Poirier's opinions.

2.   Whether the ALJ excluded evidence from a licensed clinical social worker in violation of SSR 06-3p.

3.   Whether the ALJ erred by failing to consider or discuss the opinion granting Plaintiff a "disability retirement" issued by the Federal Office of Personnel Management.

4.   Whether the ALJ used improper vocational expert testimony and an improper hypothetical question to the vocational expert.

5.   Whether the ALJ substituted her own judgment on medical issues for that of Plaintiff's treating physicians.

**Issue 1:    Whether the ALJ failed to give proper weight to treating physician Dr. Poirier's opinions.**

Plaintiff argues that the ALJ improperly discounted the opinions of one of her treating physicians.  Dr. Poirier is Plaintiff's long-time family physician.  The record shows that he has been her family physician since 1982, and throughout the entire relevant period in this case, which is 1995-2001.  (R. 412-23).  On June 19, 2000, five years into Plaintiff's alleged period of disability, Dr. Poirier stated that "the prognosis for significant improvement is poor.  I feel she is permanently disabled.  Her diagnoses at this time include fibromyositis, chronic fatigue syndrome, multiple allergies/sensitivities and osteoarthritis.  Return to any work at this time would contribute to a worsening of her condition . . . ."  (R. 408).

Eight months later, on March 20, 2001, Dr. Poirier reiterated his opinion, stating that Plaintiff "is totally disabled at this time because of multiple problems including fibromyalgia/fibromyositis, chronic fatigue syndrome, multiple allergies/sensitivities and . . . pain related to osteoarthritis and costochondritis." He further reported that the severity of the allergies "can cause a sensitivity reaction with severe worsening of her fibromyalgia pain and a pseudo-seizure type reaction.  This obviously limits all her activities even her routine activities of daily living."  He stated that her prognosis was poor.  He further stated that Plaintiff was unable to work at any occupation.  (R. 407).

Although her opinion is quite thorough in every other respect, the ALJ mentions Dr. Poirier in only one small paragraph, as follows:

> The order of the Appeals Council requires an analysis of Dr. Poirier's statement dated March 20, 2001.  He notes that the claimant's multiple chemical sensitivities are particularly disabling.  No medical professional has observed a reaction by the claimant to any substance and the diagnoses are based upon the claimant's self-report.  In addition, the limitations set forth in the hypothetical which essentially preclude exposure to chemicals give the claimant the benefits [sic] of the doubt on this issue.  The Appeals Council apparently felt that the limitation in the prior decision regarding interaction with the public was related to a psychological condition but it is solely related to the chemical sensitivity issue.

(R. 548).

This recitation does not discuss Dr. Poirier's other letter of opinion dated June 19, 2000 (R. 408), nor does it discuss in any detail Plaintiff's course of treatment throughout the time period of 1995-2001 with Dr. Poirier.  SSR 96-2p

provides guidance to the ALJ and this court regarding how to evaluate the opinions of treating physicians.  In pertinent part, it provides that:

> 2.    Controlling weight may be given only in appropriate circumstances to medical opinions, i.e., opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.
>
> 3.    Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.
>
> 4.    Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.
>
>                          *****
>
> 7.    A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator.

SSR 96-02p.  When issuing a non-favorable decision,

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

*Id.*

A review of Dr. Poirier's records and opinions shows that the ALJ clearly was not required to give it "controlling weight."  Dr. Poirier's opinions about Plaintiff being "disabled" are not *medical* opinions.  Dr. Poirier's diagnosis opinions – that Plaintiff has fibromyalgia, fibromyosis, CFS, multiple

allergies/sensitivities, and osteoarthritis – are not supported in Dr. Poirier's records by any showing of clinical and laboratory techniques.  (R. 403-12).[2]

However, under SSR 96-2p, even when not entitled to "controlling weight," a treating source's medical opinions may still be entitled to deference.  And, if rejected or not given deference, the ALJ must give a "brief" explanation of the weight given.

In this case, it is not clear whether the ALJ considered or gave weight to any of Dr. Poirier's opinions about any other aspect of Plaintiff's condition except her "chemical sensitivity."  It is not clear whether or not the ALJ considered the other conditions described as fibromyositis, CFS, and osteoarthritis because they are not mentioned at all.  It is certainly possible that the ALJ reviewed all of Dr. Poirier's notes from visits, and concluded that there was not sufficient objective medical testing or examination from which Dr. Poirier could have made such diagnosis.  However – and we are mindful of what a substantial caseload ALJ's must maintain – the court is left uncertain from the ALJ's opinion what weight was given to Dr. Poirier's opinions.  The court does not see in the regulations that a "family physician's opinions" are to be treated differently from any other

_____

[2]The court recognizes that Plaintiff's fibromyalgia or CFS are the types of conditions not always amenable to easy diagnosis by clinical or laboratory techniques. However, having reviewed SSR 99-2p for evaluating CFS, we can find only very sporadic mention in Dr. Poirier's barely legible records of the fact that he personally found, during an examination, medical signs such as "palpably swollen or tender lymph nodes, nonexudative pharyngitis, [or] persistent, reproducible muscle tenderness on repeated examinations."  (R. 412-18).  Neither do the records indicate that Dr. Poirier himself performed or received copies of MRIs, tilt table testing, or EBV virus testing.  Without these records, diagnosis of CFS, at least, lacked medical criteria for a medically determinable impairment.

"treating" source.  In this case, the ALJ has not followed SSR 96-2p with respect to Dr. Poirier's opinions on fibromyalgia, CFS, or Plaintiff's other "non-chemical sensitivity" conditions.  The weight to be given Dr. Poirier's medical opinions on these aspects of Plaintiff's condition are not even "briefly" mentioned.

**Issue 2:      Whether the ALJ excluded evidence from a licensed clinical social worker in violation of SSR 06-03p.**

Plaintiff also argues that the ALJ disregarded SSR 06-03p in evaluating the opinions of Christi Ryan.  Ms. Ryan, a licensed clinical social worker, has been providing mental health therapy to Plaintiff since 1998.  On March 15, 2001, Ms. Ryan reported a diagnosis of "post-traumatic stress disorder (chronic) and dysthymic disorder" from her agency.  (R. 400).  Ms. Ryan was of the opinion that Plaintiff could not handle full-time work.  (R. 405).  She listed Plaintiff's symptoms as memory impairment, perceptional or thinking disturbances, emotional lability, mood and emotional disturbance, sleep loss, psychomotor retardation, decreased energy, feelings of guilt and worthlessness, and difficulty concentrating or thinking.  (R. 401-02).  Ms. Ryan clearly explained how encounters with people in both social and working situations triggered Plaintiff's symptoms.  Ms. Ryan felt these symptoms also affected Plaintiff's concentration, social functioning, and activities of daily functioning as "pain and lethargy cause an introverted attitude, irritability and withdrawal, and decreased social functioning."  (R. 404).

Plaintiff argues that this was a clear opinion from a long-time treating therapist that Plaintiff is disabled due to her mental impairments.

The ALJ rejects this opinion because "Ms. Ryan is not an acceptable medical source." (R. 545). In rejecting Ms. Ryan's opinion on this basis, Plaintiff argues that the ALJ violated SSR 06-03p entitled "Considering Opinions and Other Evidence from Sources Who Are Not 'Acceptable Medical Sources' in Disability Claims . . . ." SSR 06-03p provides that an ALJ may use evidence from other medical sources, in addition to "acceptable medical sources," regarding a person's impairment and her ability to function. Those "other sources" include professionals such as nurse practitioners, physician assistants, and "licensed clinical social workers." (R. 406).

Specifically, SSR 06-03p states:

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function.

SSR-06-03p.

In this case, the ALJ does appear to have followed the SSR. Her analysis of the record indicates that Ms. Ryan's "diagnosis" could not be accepted to establish that Plaintiff has "Post Traumatic Stress Disorder." However, the ALJ did indicate that Ms. Ryan's notes did demonstrate "a significant amount of turmoil in the claimant's family" – thus indicating that she gave some weight to the source's opinion as to "severity" of the impairment. This court concludes that the ALJ did properly consider Ms. Ryan's opinions under SSR 06-03p.

**Issue 3:**    **Whether the ALJ erred by failing to consider or discuss the opinion granting Plaintiff a "disability retirement" issued by the Federal Office of Personnel Management.**

On August 30, 1995, the federal government's Office of Personnel Management ("OPM") issued a decision finding that Plaintiff was eligible for a disability retirement payment under their rules.  (R. 88-91, 130).  The ALJ fails to mention this fact in her decision.  Also, while the ALJ made passing reference to SSR 06-03p in her decision (R. 545), she did not discuss this Social Security Ruling in any detail.

SSR 06-03p provides that even though the Social Security Administration is not bound by the disability determinations of other government agencies, "the adjudicator should explain the consideration given to these decisions in the notice of the decision for hearing cases."  In addition, courts have held that the ALJ must give at least some weight to disability determinations of other governmental agencies.  In *Allord v. Barnhart,* the Seventh Circuit found that the ALJ had to give some evidentiary weight to the Veteran's Administration's decision that the individual was disabled under the rules.  *Allord v. Barnhart,* 455 F.3d 818 (7th Cir. 2006).

It is clear, therefore, that the ALJ committed error in this case – but is it reversible error?  The answer in this case is "no" for two reasons.  As the Commissioner points out, the test used to determine disability under the OPM standard is whether an employee demonstrates that she is no longer able to give useful and efficient service in her *current position* and that the agency cannot

accommodate her in her present position or a vacant position.  5 C.F.R.

*Information about Disability Retirement* (CSRS) 2-3 available at http://www.opm.

gov/retire/html/library/sf3112-1.pdf; *Information About Disability Retirement*

(FERS), 2-3 available at http://www.opm.gov/retire/html/library/sf3112-2.pdf.

Thus, the OPM's decision was that Plaintiff could not perform her "current

position" with the government in 1995.  The ALJ in this case also found that

Plaintiff could not perform her past relevant work.  (R. 549).  The ALJ's decision

was, therefore, *consistent* with the OPM's decision, and the failure to discuss this

piece of evidence did not have any affect on the ALJ's decision in any relevant

way.

Secondly, the OPM decision in 1995 predates the period of eligibility at

issue in this case.  As previously discussed, Plaintiff did not appeal the final

decision of the Secretary dated January 23, 1996.  The August 1995 decision

was sufficiently before Plaintiff's period of eligibility to render that decision

relatively immaterial to the issues before the ALJ.

Therefore, although it may have been a better practice to more thoroughly

discuss the OPM decision, there is no reversible error in this case for failing to

do so.

**Issue 4:     Whether the ALJ used improper vocational expert testimony
                 and an improper hypothetical question to the vocational expert.**

Plaintiff argues that the ALJ erred by disregarding the opinions of

vocational expert Dr. Kern, who testified at Plaintiff's second administrative

hearing, and instead improperly relied on the opinion of Dr. Mehaffey, who

testified at Plaintiff's first hearing.  As the Seventh Circuit has noted, "resolution of evidentiary conflicts lies within the exclusive domain of the ALJ, including the reconciliation of contradictory vocational expert testimony." *Ehrhart v. Secretary of Health and Human Services,* 969 F.2d 534, 541 (7th Cir. 1992).

As a preliminary matter, Plaintiff argues that the ALJ committed error by failing to inquire on the record in either hearing whether the testimony of the VE was consistent with the Dictionary of Occupational Titles ("DOT").  SSR 00-4p provides that "occupational evidence provided by the VE . . . generally should be consistent with the occupational information supplied by the DOT," and that "as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency."  Defendant concedes that this specific inquiry was not made during the hearing, and the court's examination of the record shows that no such explicit question was asked of either vocational expert.

Plaintiff, however, has failed to establish in her brief that there is any arguable conflict between the VE's testimony and the DOT's description of the same jobs.  The court believes that, in the absence of a showing of some conflict – and, therefore, a showing that the ALJ might have been operating under faulty assumptions about the physical requirements of a particular job – the failure to ask such a question is harmless error.  *Prochaska v. Barnhart,* 454 F.3d 731 (7th Cir. 2006)(requiring the court to conduct a harmless error analysis when the failure to ask such a question has occurred).

As for the ALJ's decision to select which VE's testimony to adopt, the court notes that Plaintiff had her first hearing on February 7, 2002, at which time VE Mahaffey testified and identified jobs that Plaintiff could perform. (R. 526). The first hearing decision was appealed, and after a remand, a second hearing was held in front of the same ALJ on September 13, 2006. In response to the hypothetical at the second hearing, VE Kern stated that there were no jobs that Plaintiff could perform. (R. 689-90). Thus, the ALJ could not identify any jobs Plaintiff could perform based on VE Kern's testimony at the second hearing and, therefore, the ALJ could not carry the Commissioner's step five burden based on VE Kern's testimony. Instead, the ALJ relied upon VE Mehaffey's testimony from the first hearing (held four-and-a-half years earlier), and used that testimony to identify jobs that Plaintiff could perform.

The court concludes that the ALJ is entitled to determine which VE testimony to believe, so long as the hypothetical question asked of each is supported by a complete listing of all limitations supported by substantial evidence in the record. *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002). Hence, the court's task is to determine if the hypothetical questions asked of VE Mehaffey were supported by a complete listing of all of Plaintiff's limitations.

In the 2002 hearing with VE Mehaffey, the hypothetical question was asked as follows:

> All right, if you assume a person of Claimant's age, education, and
> work experience who has the physical ability to do sedentary work
> of at least a semiskilled nature, that requires a clean environment,

> no contact with the public, no physical exposure to the
> public and only rare or minimal exposure to cigarettes,
> chemicals, fumes, gases, could such a person return to any
> of Ms. Wools past work?

(R. 524-25).

Plaintiff argues that this question is incomplete because it does not take into account Plaintiff's mental impairments of depression/dysthymia, somatoform disorder, and post-traumatic stress disorder.  (Plaintiff's Brief at 15). The court's review of the transcript leaves us with some uncertainty about the ALJ's findings as to Plaintiff's mental condition.

When the second hearing was held after a remand, the ALJ engaged in the following colloquy:

> ALJ:  Oh, and the second paragraph in the Appeals Council
> Order totally misconstrued the finding.  The no physical contact
> with the public relates to exposure to perfumes and things like
> that, deodorants.  It doesn't relate to the stress factor at all and
> they found that my Decision was inconsistent because I found the
> mental impairment was not severe but I limited her contact with
> the public but it wasn't due to the stress factor.  It was due to the
> exposure to chemicals.
> Atty:  Uh-huh.
> ALJ:  So, anyway, that's how I'm going to address that.
> That's just a misinterpretation by someone at some point.  Okay.

(R. 665-66).

From this discussion, the court assumes that, at the time of the first decision, the ALJ did *not* consider "depression" and somatoform disorder to be "severe" impairments which would result in at least some limitations to Plaintiff's ability to work.  Yet, in the ALJ's second decision itself, the ALJ does find

Plaintiff to have a "severe combination of impairments" which included "depression" and "somatoform disorder." (R. 543).

As quoted above, the ALJ's hypothetical question to VE Mehaffey clearly did not *explicitly* include the words "depression" or "somatoform disorder." Can it be that such conditions were *implicitly* included in the hypothetical question when the question included the restrictions that there be "no contact with the public, no physical exposure to the public . . . ?" (R. 524-25).

We must return to the portion of the ALJ's second opinion in 2007 where the ALJ explains which limitations she was relying on:

> In addition, the limitations set forth in the hypothetical which essentially preclude exposure to chemicals give the claimant the benefits [sic] of the doubt on this issue. *The Appeals Council apparently felt that the limitation in the prior decision regarding interaction with the public was related to a psychological condition but it is solely related to the chemical sensitivity issue.*

(R. 548)(emphasis added).

From reading this portion of the ALJ's opinion, the court must conclude that, at the time the ALJ asked the hypothetical question to VE Mehaffey, it was her intention that the hypothetical include only concerns of "chemical sensitivity" and did not mean to imply that Plaintiff also had additional serious mental conditions of "depression" or "somatoform disorder." The hypothetical question asked to VE Mehaffey in 2002 did not, therefore, include reference to all of Plaintiff's "severe" impairments which the ALJ eventually found Plaintiff to suffer from in 2007. Because the hypothetical question was incomplete, the

answers given by VE Mehaffey cannot be considered "substantial evidence" in support of the Commissioner's decision.

Because the ALJ was not able to rely on the answers of VE Mehaffey, the court must examine whether the answers of VE Kern should have been relied on instead.  The ALJ's questioning of Dr. Kern, in pertinent part, is as follows:

> Q   Okay. For the first hypothetical, please assume a person of Claimant's age, education and work experience who has the ability to perform sedentary work, requires a clean environment with rare or minimal exposure to fumes, dusts, gases, odors and other respiratory irritants and no physical contact with the public. That is the same as the hypothetical that was used in the prior decision.  The limitation regarding physical contact with the public relates to exposure to perfumes, colognes, fabric softeners, detergents, nail polish, that sort of thing, hair spray.  Would the past work, as a computer specialist, still be available?
> A   The problem is the exposure to those fumes and almost any environment would have some degree of exposure so I'd say she's not going to be employable under this hypothetical.
> Q   The hypothetical was for rare or minimal exposure which I guess would come from coworkers and then no contact with the public.  In a work environment, do you feel she would have more than rare or minimal exposure to those substances?
> A   I believe so.

(R. 689-90).

Because it is not clear from the ALJ's hypothetical questions to VE Kern whether the ALJ included the limitations resulting from the severe mental conditions of "depression" or "somatoform disorder," the court is unable to determine whether the hypothetical questions asked of VE Kern were also incomplete.  In this case, therefore, the court is unable to ascertain whether the

ALJ's hypothetical questions to VE Kern incorporated all of the severe impairments that the ALJ found.  There is error in the opinion in this regard.

**Issue 5:     Whether the ALJ substituted her own judgment on medical issues for that of Plaintiff's treating physicians.**

The ALJ found that Plaintiff's only severe impairments were chemical sensitivities/allergies, depression, a somatoform disorder, and mild degenerative disc disease.  (R. 543).  The ALJ did not include fibromyalgia and CFS as "severe" impairments.  An impairment is "severe" if it significantly limits a person's ability to meet the basic physical or mental demands of work such as lifting, standing, and understanding and carrying out instructions.  20 C.F.R. § 404.1521.

Plaintiff argues that by failing to include the fibromyalgia and CFS conditions as severe impairments, the ALJ improperly "played doctor" and substituted her own judgment for that of the treating physicians.  Seventh Circuit opinions, such as *Rohan v. Chater,* 98 F.3d 966 (7th Cir. 1996), as well as SSR 99-2p, recognize that CFS can be a severe impairment, and that an ALJ must take certain steps to evaluate such conditions when confronted with the issue.[3]

---

[3]As a preliminary matter, the court notes that failure to specifically find fibromyalgia or CFS to be a "severe" impairment does not, per se, require reversal of the decision, so long as the ALJ did consider the effect of those conditions in her evaluation of Plaintiff's RFC.  The Regulations require, at step two of the five-step sequential evaluation process, that an ALJ must only determine whether or not Plaintiff has an impairment, or combination of impairments, that is severe.  20 C.F.R. § 404.1520(e)(4)(ii).  This is so because the severity standard is a threshold inquiry, *see Maggard v. Apfel,* 167 F.3d 376, 378 (7th Cir. 1999), and is used as an

(continued...)

Here, the ALJ's discussion of the evidence shows that she considered the combination of Plaintiff's impairments, including her fibromyalgia and CFS, as the ALJ referred to them repeatedly throughout her discussion of the evidence. (R. 543-45). The ALJ also recounted Plaintiff's own complaints concerning her fatigue and pain associated with fibromyalgia. (R. 547). The ALJ mentioned Dr. Poirier's opinion which referred to these diagnoses as well as the assessment of Dr. Grau, who evaluated Plaintiff's fibromyalgia symptoms specifically. (R. 548). Thus, the ALJ considered Plaintiff's diagnoses of fibromyalgia and CFS in her assessment of Plaintiff's RFC. Furthermore, the ALJ found Plaintiff could perform only sedentary exertional work and thus highly restricted the amount of physical activity in which she could engage.

With respect to Plaintiff's CFS, the medical records which establish that diagnosis consist of the opinions of Dr. Pettigrew and Dr. Grau. Dr. Pettigrew submitted an opinion in a letter of July 17, 1995. (R. 264-66). This was about six months prior to Plaintiff's period of disability at issue in this case. The diagnosis was apparently based on an examination conducted in December 1994, and four follow-up office visits in February, March, and June 1995. (R. 272-74). Of these visits, one involved complaints of fatigue in February (R. 274),

---

[3](...continued)
"administrative convenience to screen out claims that are totally groundless solely from a medical standpoint." *Higgs v. Bowen,* 880 F.2d 860, 862-63 (6th Cir. 1988). If the ALJ concludes that a claimant has an impairment or combination of impairments that is severe, the ALJ then continues with the other steps in the evaluation. *See Maziarz v. Secretary of Health & Human Services,* 837 F.2d 240, 244 (6th Cir. 1987)(ALJ's failure to label an impairment severe was not reversible error because the ALJ found other severe impairments and continued with the sequential evaluation).

one involved complaints of "excruciating pain" in Plaintiff's right foot and neck in March (R. 273), and a third in June involved Plaintiff asking "to be seen for routine check, no problem.  PS 100% having normal life." (R. 272).

Dr. Grau's opinion that Plaintiff suffered from CFS is contained in a questionnaire.  (R. 441).  In it, he spends most of the time describing "fibromyalgia" and also checked a box on the form indicating that CFS was present.

The ALJ did discuss the opinions of Dr. Pettigrew and Dr. Grau (R. 545) and described the conditions in the section of her decision where she discussed other "severe" impairments.  The court, therefore, concludes that the ALJ did not ignore these conditions.

The question then arises:  Did the ALJ follow the requirements of SSR 99-2p?  In pertinent part, that particular ruling concludes that a diagnosis of CFS can serve as a basis for a finding of disability.  "CFS constitutes a medically determinable impairment when it is accompanied by medical signs or laboratory findings, as discussed below.  CFS may be a disabling impairment."  SSR 99-2p. Examples of "medical signs" that establish the existence of CFS include

> the concurrence of 4 or more of the following symptoms, all of which must have persisted or recurred during 6 or more consecutive months of illness and must not have pre-dated the fatigue:
> - Self-reported impairment in short-term memory or concentration severe enough to cause substantial reduction in previous levels of occupational, educational, social, or personal activities;
> - Sore throat;

- Tender cervical or axillary lymph nodes;
- Muscle pain;
- Multi-joint pain without joint swelling or redness;
- Headaches of a new type, pattern, or severity;
- Unrefreshing sleep; and
- Postexertional malaise lasting more than 24 hours.

*Id.* The evaluation process is to be used by the ALJ, and his or her opinion must enable the reviewing court to determine that the evaluation was performed. From a review of the ALJ's decision, this court cannot determine whether the ALJ did attempt to follow the regulation and discern from doctors' notes whether Plaintiff's reports of lack of concentration, sore throat, tender lymph nodes, muscle pains, multi-joint pain, and unrefreshing sleep existed for the appropriate period of time.  If so, the medical records may have supported the diagnoses of Dr. Pettigrew and Dr. Grau.  On the other hand, it is far from clear that the medical records in this case do clearly establish the requisites for diagnosis of the condition – which may render the opinions of these doctors unsupported by the type of evidence necessary to establish the existence of CFS. This court is unable to determine whether the ALJ did complete the analysis called for by SSR 99-2p.

### VII.  Conclusion

This court is mindful of the limited scope of review that is our function, and of the crushingly large caseloads faced by ALJs who perform this function. This ALJ was faced with the extremely difficult task of evaluating claims of fibromyalgia and CFS.  This particular Plaintiff was previously diagnosed as

being unable to perform her past work by the Federal Office of Personnel Management, yet by her own admission takes long trips to Alaska and Florida; so she does not clearly fall into a category of a person whose activities of daily living are substantially impaired.

While the ALJ has made a good effort to evaluate this complicated case, this court concludes that she did not evaluate the weight that she gave to the treating physician, Dr. Poirier; she did not use a clear hypothetical when asking questions to the vocational experts; and we are unable to discern whether her analysis of Plaintiff's CFS followed the relevant regulation for analysis of that condition.  Therefore, although it is far from certain that Plaintiff is unable to engage in any gainful employment, this case must be **REMANDED** for a clearer determination of her status.

**SO ORDERED** this 28th day of April, 2009.

_____
WILLIAM G. HUSSMANN, JR.
Magistrate Judge

**Electronic copies to:**

Jim P. Brown
RABIN & ASSOCIATES
jim@rabinsslaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov